## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Rickey Paul VanDyke, Sr.,                    **Case No. 14-cv-224 (SRN/SER)**

       Plaintiff,

v.                                           <u>**REPORT AND RECOMMENDATION**</u>

City of Minneapolis,

       Defendant.

---

    Rickey Paul VanDyke, Sr., *Pro Se*, Minneapolis, Minnesota.

    Kristin R. Sarff, Lindsey E. Middlecamp, Esqs., Minneapolis City Attorney's Office, Minneapolis, Minnesota, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

    The above-captioned case comes before the undersigned on Defendant City of Minneapolis's ("the City") Motion for Summary Judgment [Doc. No. 48]. This motion was referred pursuant to 28 U.S.C. § 636(b)(1)(A), (B), and (C), and District of Minnesota Local Rule 72.1. (Order of Reference Dated Mar. 21, 2016) [Doc. No. 67]. For the reasons stated below, the Court recommends the City's Motion for Summary Judgment be granted.

## I.    INTRODUCTION

    Plaintiff Rickey Paul VanDyke, Sr., ("VanDyke") alleges he was terminated from his job as a Minneapolis police officer on November 30, 2012, because of his age. (Compl.) [Doc. No. 1 at 7].[1] He avers that age discrimination within the Minneapolis Police Department (the "MPD") started in 2009 and continued up until his termination in November 2012. (*Id.* at 8–13). The

---

[1]     The Court refers to page numbers assigned by the CM/ECF system for the entirety of the documents referred to in this Report and Recommendation.

Honorable Susan Richard Nelson, however, dismissed VanDyke's claim of continuing discrimination based on this Court's previous Report and Recommendation. *See VanDyke v. Minneapolis Police Dep't*, No. 14-cv-224 (SRN/SER), 2015 WL 138060 (D. Minn. Jan. 7, 2015) (Nelson, J., adopting report and recommendation of Rau, Mag. J.).[2] Thus, VanDyke's claim is limited exclusively to his November 30, 2012 termination and not VanDyke's claim of continuing discrimination. The undisputed facts with respect to VanDyke's remaining claim follow.[3]

## II.    BACKGROUND

### A.    Factual Background

#### 1.    November 30, 2012 Termination

In June 2012, the Internal Affairs Unit (the "IAU") of MPD investigated VanDyke after it was discovered that he stored three firearms obtained from a 911 call in his personal residence for forty-three days. *See* (Compl. at 13); (VanDyke Dep., Ex. A, Attached to Aff. of Lindsey E.

---

[2]    VanDyke did not allege continuing discrimination in his Equal Employment Opportunity Commission ("EEOC") filing. *See VanDyke*, 2015 WL 138060, at *3–4; (EEOC Filing, Ex. A, Attached to Aff. of Darla J. Boggs, "Boggs Aff.") [Doc. 10-1 at 1]. Instead, he only alleged that his November 30, 2012 termination resulted from age discrimination. (EEOC Filing). Thus, VanDyke could not allege in his amended complaint that the discrimination started before his November 30, 2012 termination. *See VanDyke*, 2015 WL 138060, at *3–6. Here, VanDyke attempts to argue, again, that the events which took place between 2009 and 2012 show continuing discrimination, and he does so by detailing his entire employment history with MPD. *See* (VanDyke's Mem. in Resp.) [Doc. No. 55 at 2–7]. This Court views VanDyke's employment history, which is summarized in *VanDyke*, 2015 WL 138060, at *1–2, only in light of his 2012 termination and not in light of VanDyke's claim of continuing discrimination.

[3]    In each of their respective memorandums, VanDyke and the City provide lengthy descriptions of VanDyke's employment history, other than his November 30 termination in 2012, including incidents that led to discipline as well awards VanDyke earned throughout his career. *See* (City's Mem. in Supp.) [Doc. No. 50 at 4–6]; (VanDyke's Mem. in Resp. at 2–7). Because VanDyke's claim of continuing discrimination was dismissed, VanDyke's entire employment history is not relevant to this Court's recommendation. *See VanDyke*, 2015 WL 138060, at *1–6. Consequently, this Court will address the facts surrounding VanDyke's remaining claim—that the November 30 termination resulted from age discrimination.

Middlecamp, "Middlecamp Aff.") [Doc. No. 51-1 at 58]; (EEOC Filing). VanDyke's retention of firearms violated MPD policy, discussed in further detail below. VanDyke was terminated on November 30, 2012, when he was sixty-two years old; VanDyke alleges the evidence presented to terminate him was "skewed to support a biased agenda" and that he was terminated because of his age. (Compl. at 13).

**2.      MPD Policy**

MPD has a policy and procedure manual (the "Manual"), with a code of ethics that provides:

> All sworn and civilian members of the department shall conduct themselves in a professional and ethical manner at all times and not engage in any on or off-duty conduct that would tarnish or offend the ethical standards of the department.

(Pl.'s Ex. D) [Doc. No. 56 at 19].[4] Any police officer who violates the code of ethics is subject to discipline, including termination. *See* (Discipline Matrix, Ex. F, Attached to Middlecamp Aff.) [Doc. No. 51-6 at 8]. The Manual also contains a provision on truthfulness:

> The integrity of police service is based on truthfulness. Officers shall not willfully or knowingly make an untruthful statement, verbally or written, or knowingly omit pertinent information pertaining to his/her official duty as a Minneapolis Police Officer. MPD employees shall not willfully or **knowingly make an untruthful statement** or knowingly omit pertinent information in the presence of any supervisor, **intended for the information of any supervisor**, or before any court or hearing. Officers shall not make any false statements to justify a criminal or traffic charge or seek to unlawfully influence the outcome of any investigation. These requirements **apply to any report**, whether verbal or written, concerning **official MPD business** including, but not limited to, written reports, transmissions to MECC and officers via radio, telephone, pager, e-mail or MDC.

---

[4]      VanDyke filed exhibits in one document yet separates the exhibits using letters. *See* (Pl.'s Ex. A–S) [Doc. No. 56]; (Pl.'s Ex. A–C) [Doc. No. 20]. For ease of reference, the Court refers to VanDyke's exhibit letter and cites to the page assigned by CM/ECF, with the exception of the IAU Investigation Report, which is referred to as "IAU Investigation Report." *See infra* Part II.A.3.

(Manual, Ex. E, Attached to Middlecamp Aff.) [Doc. No. 51-5 at 2] (emphasis added). A violation of this provision also warrants termination. *See* (Discipline Matrix at 7).

In addition to the provision on truthfulness, the Manual requires police officers to inventory property obtained in their line of duty "prior to the end of their shift . . . regardless of whether an arrest was made." (Manual at 3). Inventory is completed with MPD's Property and Evidence Unit, and the retention of any property or evidence for personal use is prohibited. (*Id.*).

The Manual, nevertheless, does not treat all property equally. Upon obtaining a **firearm**, police officers must do more than an inventory—they must also complete a "trigger tag," noting the police officer's badge number, date and time of recovery, serial number, case control number, and any other identifying information. *See* (Manual at 5). Police officers must also submit a CAPRS report (a type of police report), detailing the "circumstances of the recovery of the firearm" and "identifying involved parties." (Manual at 7); (VanDyke Dep. at 56).

There are no circumstances that would allow a police officer's unilateral decision to release inventoried or seized firearms to a third party.[5] (Manual at 9). Only "the Criminal Investigations Division Commander, or their designee, has the authority to release firearms that have been inventoried in the Property and Evidence Unit." (*Id.*). And "[p]rior to the release of the firearm to the owner, Property and Evidence Unit personnel will ensure that the firearm is released pursuant to Minn. Stat. § 624.713." (*Id.*). Specifically, the Property and Evidence Unit conducts background checks before the release of a firearm. (Property & Evidence Unit Procedure, Ex. A, Attached to Second Middlecamp Aff.) [Doc. No. 59 at 3]. A background check must be pre-authorized by the Criminal Investigation Division Commander, or his or her designee, before it can occur. (*Id.*). In the event the foregoing is authorized, and the background

---

[5]     Any firearm seized has to be inventoried per the Manual. *See* (Manual at 9).

check is "clear," an appointment must be scheduled with the Property and Evidence Unit in order to release a firearm to a civilian. (*Id.* at 5); (Manual at 9).

In addition to the Manual, MPD also has a "Discipline Matrix" that offers guidelines for disciplinary decisions. *See* (Discipline Matrix at 1–11). The Discipline Matrix separates offenses by category, specifically "A–D." (*Id.* at 6). Under the Matrix, Category D violations, which include violations of section 5.101.01 (truthfulness) and section 5.102 (code of ethics) of the Manual, may result in termination. (*Id.* at 6–8); *see also* (Manual at 2) (truthfulness); (Pl.'s Ex. D at 19) (ethics). The chief of police, however, has ultimate authority over whether or not to terminate a police officer. *See* (Discipline Matrix at 6).

### 3.    May 3, 2012 Incident

On May 3, 2012, VanDyke and his partner responded to a 911 call at Willman Trucking ("Willman") where an individual reported finding three shotguns (the "Firearms"). (VanDyke Dep. at 44–45). The report, entered by MPD dispatch, read: "Willman Trucking/Back of [building,] see Dave – found 3 shotguns warpped [sic] in blanket in an unused tanker truck[;] Dave will keep an eye on them until police arrive." (Incident Detail Report, Ex. G, Attached to Middlecamp Aff.) [Doc. No. 51-7 at 2]; (VanDyke Dep. at 53). Upon arriving at Willman, VanDyke and his partner were directed to the Firearms, which were lying on the ground and, in VanDyke's opinion, looked like "junk." (VanDyke Dep. at 45–46) (IAU Interview Tr., Ex. H, Attached to Middlecamp Aff.) [Doc. No. 51-8 at 4]. VanDyke, who himself owned around sixty firearms at the time, inspected the Firearms, performed a field test, and determined they could not fire. (VanDyke Dep. at 5, 46–48). According to VanDyke, at this point in time on May 3, 2012, he fully intended to inventory the Firearms. (*Id.* at 49–50).

Shortly thereafter, however, VanDyke "felt the dynamics of the entire call had changed" when an employee of Willman expressed interest in keeping the Firearms. (VanDyke Dep. at 49); (IAU Interview Tr. at 8). VanDyke communicated to the employee that before he could give the Firearms to anyone at Willman, he was required to determine whether the Firearms were reported stolen. (VanDyke Dep. at 51–52); (IAU Interview Tr. at 7–8). It was VanDyke's belief that, despite the Manual's requirement with respect to **firearms**, all three shotguns could be returned to Willman, so long as the shotguns were not reported stolen. *See* (VanDyke Dep. at 51–52, 55); (IAU Interview Tr. at 7–8).

Next, using the computer inside of the squad car, VanDyke testified that he and his partner attempted a "query," or a report, on two of the shotguns, and discovered those two shotguns were not stolen. (IAU Interview Tr. at 6, 8); (VanDyke Dep. at 49–51). A query is generally completed by entering a serial number from a firearm into MPD's database, which will either return a message that a firearm is stolen, or is not stolen. (VanDyke Dep. at 50). Despite this attempt, however, there is no record that there was a query made from the squad car in which VanDyke and his partner used during the incident. (IAU Investigation Report, Ex. A) [Doc. 20 at 2]. Moreover, VanDyke and his partner were unable to attempt a query for the third shotgun, because they could not determine its serial number at the scene. (VanDyke Dep. at 49). VanDyke told his partner that he would "take care of that" and stated he would disassemble the third shotgun, find its serial number, and then run a report. (VanDyke Dep. at 55); (IAU Investigation Report at 13).

Instead of running a report on the third shotgun, VanDyke took possession of all three Firearms, drove them to his personal residence, and placed them in his garage.[6] (VanDyke Dep. at 3, 52, 56–58).

> Q: Why didn't you inventory the three shotguns in property and evidence with the Minneapolis Police Department?
>
> A: Because the individual had said he wanted them . . . back, I decided to do some PR and took it to determine that they were not relinquishing the property, they wanted them back, and I felt I was under no obligation to go ahead and do an inventory.

(*Id.* at 52). This same day, VanDyke, who considers himself a firearms identification expert, and knowing the Firearms were real—not toys—entered an "Incident Detail Report" from the computer in the squad car that stated, with respect to the Firearms: "**replicas** found in trash caller will dispose."[7] (VanDyke Dep. at 46–47, 52–54) (emphasis added); (Incident Detail Report at 2); (IAU Interview Tr. at 13).

Forty-three days later, on June 19, 2012, MPD sent VanDyke an email, advising that he was under investigation by the IAU for truthfulness and ethics stemming from the Firearms incident. (VanDyke Dep. at 60); (IAU Interview Tr. at 9–10, 18). The next day, VanDyke returned to Willman and gave the Firearms to an employee, but did not ask the employee for any identification nor did he seek any permission from his supervisors at MPD. (VanDyke Dep. at 61, 65–66). At no time during the forty-three days did VanDyke inventory the Firearms, submit a

---

[6]    Unbeknownst to VanDyke, an employee of Willman, Lisa Wilson ("Wilson"), contacted the MPD on May 3, 2012, to confirm her interest in keeping the shotguns. The MPD could not respond to Wilson's request because VanDyke had not yet completed an inventory. (VanDyke Dep. at 62).

[7]    This was entered directly beneath MPD's earlier report, stating that three shotguns were found. *See* (Incident Detail Report at 2).

CAPRS report detailing the incident, or create a trigger tag for any of the Firearms.[8] *See* (VanDyke Dep. at 56–58). According to VanDyke, it took him forty-three days to remove the screws from one of the shotguns. (VanDyke Dep. at 60).

### 4.    IAU Investigation and Hearing; Loudermill Panel Hearing

VanDyke was interviewed on July 3, 2012, as a part of the IAU investigation. (IAU Interview Tr. at 2). He was interviewed by Sergeant Denno, who conducted the IAU investigation. (*Id.*); *see* (IAU Investigation Report at 1). During the interview, VanDyke admitted that he (1) entered the Incident Detail Report, which stated that the Firearms were **replicas** and were left with an employee at Willman; (2) stored the Firearms in his personal residence for forty-three days; (3) took apart and cleaned one of the Firearms; (4) failed to complete an inventory, submit a CAPRS report, or create a trigger tag; and (5) gave the Firearms to a civilian, without first receiving authorization to do so. *See* (IAU Interview Tr. at 8, 9, 11, 13, 15). VanDyke stated that he ran a query on the Firearms from the squad car. (IAU Interview Tr. at 5–7); (IAU Investigation Report at 20). VanDyke also stated that it was not his intent to keep the Firearms for personal use, and in writing "replica" to describe the Firearms in his Incident Detail Report, he meant the Firearms did not have the ability to fire.[9] (IAU Interview Tr. at 9, 12). In addition, VanDyke stated that he was unable to return the Firearms during the forty-three days

---

[8]    Until his deposition, VanDyke did not know what constituted a trigger tag. (VanDyke Dep. at 57).

[9]    VanDyke asserts he did not take the shotguns to his house for personal use. The Court nonetheless observes: (1) VanDyke was a gun collector who owned more than sixty firearms at the time of the May 3, 2012 incident; (2) VanDyke took three firearms with him to his house on May 3, 2012; (3) VanDyke knowingly stated in the Incident Detail Report that the firearms were "replicas;" (4) VanDyke cleaned one of the shotguns during the forty-three days at issue; and (5) he did not return the shotguns until he received notice he was under investigation. *See* (VanDyke Dep. at 4–5, 52–54, 56–58, 60, 65–66); (IAU Interview Tr. at 8–15). These facts make VanDyke's assertion not credible; that assertion, however, and whether VanDyke intended to keep the guns himself, is largely unimportant in light of what this Court recommends.

because he did not have a car to use for transportation. (*Id.* at 14). Moreover, VanDyke stated

that he did not see the email advising him of the IAU investigation until June 21. (*Id.* at 10–11).

The IAU investigation nonetheless found VanDyke violated the Manual's truthfulness

and code of ethics provisions. (Loudermill Panel Hr'g, Ex. I, Attached to Middcamp Aff.)

[Doc. No. 51-9 at 2]. It determined that VanDyke knowingly reported in the Incident Detail

Report that **replica** firearms were found, he did not properly conduct a query check, he did not

properly inventory the Firearms, and he gave the Firearms to a civilian without conducting a

background check. (*Id.*); *see* (IAU Investigation Report at 15–16). A panel met on November 5,

2012, and "sustained the findings that . . . VanDyke had violated both the above policies."

(Loudermill Panel Hr'g at 2). It charged VanDyke with violating 5-101.01 (Truthfulness) (false

added remarks to call), 5-101.01 (Truthfulness) (firearms query check not done as reported), and

5-102 (Code of Ethics) (discretion—fail to inventory firearms taken into possession).

(Recommendation for Discharge by MPD, Ex. J, Attached to Middcamp Aff.) [Doc. No. 51-10

at 2–4].

Three weeks later, VanDyke attended a Loudermill Panel Hearing so that he could offer

mitigating circumstances to be considered in light of the May 3 incident.[10] (Loudermill Panel

Hr'g at 2). VanDyke stated that "[he] failed to inventory" but that his intent and purpose was to

return the Firearms to someone who worked at Willman. (*Id.* at 3). He also stated that, during his

career, he received several awards. (*Id.*). He apologized and hoped he would be given "some sort

of break." (*Id.*).

---

[10]    The Discipline Matrix allows a police officer to offer mitigating circumstances to be
considered in light of any disciplinary decision. (Discipline Matrix at 4–6). Mitigating
circumstances are offered by the police officer at a Loudermill Panel Hearing. (*Id.*). VanDyke
appeared before a "Category 'D' Panel" at the hearing, because his alleged violations fell under
the "D" category of offenses under the Discipline Matrix. (*Id.* at 7–8); (Loudermill Panel
Hearing at 2); (Recommendation for Discharge by MPD at 2–3).

MPD chief of police, Janee Harteau, reviewed the charges, the investigation, and the Loudermill Panel Hearing, which recommended termination. *See* (Recommendation for Discharge by MPD). Harteau terminated VanDyke on November 30, 2012. (*Id.*). VanDyke appealed his termination to the Minneapolis Civil Service Commission ("MCSC"). *See* (MCSC Determination, Ex. D, Attached to Boggs Aff.) [Doc. No. 10-4 at 2].

### 5.    Minneapolis Civil Service Commission; EEOC

MCSC Commissioner Ellen W. McVeigh ("McVeigh") heard oral arguments in April 2013 on VanDyke's appeal. (MCSC Determination at 2). VanDyke alleged MPD's "decision to recommend termination of his employment was motivated by his age." (*Id.* at 16). His evidence "consisted of testimony that he had been repeatedly asked when he was planning to retire, and his impression that [MPD] had been trying to get rid of him since 2009, via an increasing number of disciplinary decisions." (*Id.*). McVeigh noted that VanDyke "did not testify that Chief Harteau or any [MPD] personnel who constituted his disciplinary panel questioned him about his retirement plans" and VanDyke's "impression of bias on the basis of age [was] not supported by the evidence." (*Id.* at 17).

McVeigh determined that MPD had met its burden in showing cause for VanDyke's termination due to his violations of the Manual and as a result, recommended MCSC affirm VanDyke's discharge. (*Id.* at 9). On August 27, 2013, MCSC affirmed VanDyke's discharge through the issuance of an order. (Order Affirming Recommendation for Discharge, Ex. E, Attached to Boggs Aff.) [Doc. No. 10-5 at 2]. Although an appeal is permitted by Minnesota law, VanDyke did not appeal MCSC's order affirming his discharge.[11]

---

[11]    *See* Minn. Stat. § 179A.051(a) (2014) ("Decisions of the commissioner relating to . . . essential . . . employees . . . may be reviewed on certiorari by the Court of Appeals. A petition for a writ of certiorari must be filed and served on the other party or parties and the

Instead, VanDyke filed a Charge of Discrimination through the United States Equal Employment Opportunity Commission ("EEOC"), advising that only his 2012 termination was motivated by age discrimination. (EEOC Charge of Discrimination, Ex. A, Attached to Boggs Aff.) [Doc. No. 10-1 at 1]. The EEOC found no discrimination and notified VanDyke of his right to sue. (EEOC Notification, Ex. C, Attached to Boggs Aff.) [Doc. No. 10-3].

### B.    Additional Evidence Allegedly Related to Age

VanDyke bases his allegation of age discrimination on the following grounds.

First, VanDyke alleges that his supervisors wanted him to quit and influenced the decision to terminate him. (VanDyke's Mem. in Resp. at 10) (VanDyke Dep. at 10–11). In support, VanDyke points to MPD's ranking structure as well as evidence that his supervisors made age-related comments. *See* (VanDyke Dep. at 10–14); (Pl.'s Ex. E at 21–23). To start, in 2009 VanDyke overheard Lieutenant Lindback state, "I have an idea. Why don't we put Rickey back out on the street and maybe he'll quit." (*Id.* at 12). Around the same time, two sergeants, James Novak and Myron Taylor, accused him of "sleeping on duty" while he worked at the front desk. (VanDyke Dep. at 10, 12–13).

Between 2009 and 2010, VanDyke questioned Sergeant Novak and Taylor once about their comments with regard to VanDyke sleeping on the job. (VanDyke Dep. at 25–26). Sergeant Novak responded, "You are getting old." (*Id.* at 26). VanDyke replied that "when [he] joined the police department . . . [a] 20-year sergeant would never speak to a 20-plus-year veteran like

---

commissioner within 30 days from the date of the mailing of the commissioner's decision. The petition must be served on the other party or parties at the party's or parties' last known address.") Essential employees include police officers. *See* Minn. Stat. § 179A.03, subd. 7 (2014). Neither party addresses the issue of res judicata in their respective memorandums, but the Court notes that VanDyke could have appealed MCSC's order, affirming VanDyke's discharge, to the Minnesota Court of Appeals. *See* Minn. Stat. § 179A.051(a). VanDyke, however, did not appeal MCSC's order.

[VanDyke] the way [Novak and Taylor] do." In response, Sergeant Novak said, "Well, you're a dinosaur, Rick." (*Id.*). And finally, between 2009 and 2010 Sergeant Novak asked VanDyke on several occasions, "When are you going to retire?" (*Id.* at 27).

Second, VanDyke alleges that Sergeant Novak criticized VanDyke's work performance in 2012, and because the criticisms were "petty," Sergeant Novak must have influenced the decision to terminate VanDyke. (VanDyke's Mem. in Resp. at 25); (VanDyke Dep. at 15–16). Third, VanDyke alleges the City of Minneapolis wanted to save money by getting rid of older officers. (VanDyke's Mem. in Resp. at 6–7); (VanDyke Dep. at 21). In this regard, VanDyke proffers evidence of retirement incentive plans that were offered to police officers as recently as 2010. (Pl.'s Ex. B at 12–15).

Fourth, VanDyke alleges MPD did not train him well enough for his transition from desk duty to street patrol. (VanDyke's Mem. in Resp. at 15); (VanDyke Dep. at 8). Fifth, VanDyke alleges the IAU investigation that resulted in his termination was flawed. (VanDyke's Mem. in Resp. at 35). He bases this allegation on the fact that MPD knew he took the Firearms as early as May 3, 2012, but did not start an investigation until June 19, 2012. (VanDyke Dep. at 61–62). He also states that the investigation was "filled with a lot of misinformation." (VanDyke Dep. at 69). In support of these allegations, VanDyke submits a dictionary definition of "dispose" in order to indicate that he did not intend to keep the Firearms for personal use. (Pl.'s Ex. S at 56–58). He also submits selected provisions of the Manual, namely, the provisions on truthfulness, conduct, and ethics, in order to prove that he did not violate the Manual. (Pl.'s Ex. C at 17); (Pl.'s Ex. D at 19); (Pl.'s Ex. F at 25); (Pl.'s Ex. K at 31). And finally, he submits copies of awards he earned and violations he committed during his employment history with MPD as well as screen shots of

MPD's query database for firearms. (Pl.'s Ex. A at 4–10); (Pl.'s Ex. O at 33–49); (Pl.'s Ex. Q at 51–54).

### C.       Procedural Background

VanDyke filed this employment discrimination action on January 23, 2014, and filed an Amended Complaint on May 22, 2014. (Compl.); (Am. Compl.) [Doc. No. 4]. MPD, through the City, moved to dismiss. (MPD's Mot. to Dismiss) [Doc. No. 7]. Judge Nelson granted MPD's motion to dismiss with respect to VanDyke's claim of continuing discrimination but denied MPD's motion in all other respects. (Order Adopting R&R). By the stipulation of the parties, the Court ordered MPD's removal from the Amended Complaint in order to add the City. (Order to Amend Compl. to Add the City and Remove MPD) [Doc. No. 28]. The City filed an Answer to the Amended Complaint and on January 21, 2016, filed the Motion for Summary Judgment.[12] (Answer) [Doc. No. 29]; (Mot. for Summ. J.).

---

[12]       Pursuant to Local Rule 7.1, VanDyke had until February 11, 2016, or twenty-one days to respond to the City's Motion for Summary Judgment, but he did not file a timely response. On February 16, 2016, VanDyke asked for an extension to file his response to the City's Motion for Summary Judgment. (Mot. for Extension of Time to File Resp. as to Mot. for Summ. J.) [Doc. No. 52]. The Court granted VanDyke's request but stipulated that his response was due no later than February 22, 2016. (Order Granting Request for Extension) [Doc. No. 54]. VanDyke filed a seventy-one page response on March 1, 2016, violating the Local Rules with respect to word count as well as this Court's amended time requirements. (VanDyke's Mem. in Resp.). The City filed a Reply in Support of its Motion for Summary Judgment. (City's Reply Mem. in Supp. of Mot. for Summ. J. "City's Reply") [Doc. No. 58].
       A motion hearing regarding the City's Motion for Summary Judgment was held on March 4, 2016, but VanDyke did not appear. (Minute Entry) [Doc. No. 61]. VanDyke requested the opportunity to submit a sur-reply to the City's Reply. (Letter to Magistrate Judge Dated Mar. 14, 2016) [Doc. No. 62]. VanDyke also requested an additional hearing. (Letter to Magistrate Judge Dated Mar. 17, 2016) [Doc. No. 65]. The Court denied VanDyke's request to submit a sur-reply to the City's Reply and for an additional hearing. [Doc. No. 66]. VanDyke nevertheless filed a sur-reply to the City's Reply. (VanDyke's Sur-Reply Mem. in Resp.) [Doc. No. 68]. The Court considers VanDyke's Memorandum in its entirety but does not consider, at all, VanDyke's Sur-Reply Memorandum because the filing violates Rule 7.1.

The City argues that summary judgment is required because VanDyke cannot show that a genuine dispute as to a material fact remains with respect to VanDyke's claim of age discrimination under the Age Discrimination in Employment Act ("ADEA").

## III.   DISCUSSION

### A.   Legal Standard

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson*, 477 U.S. at 248. A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* On a motion for summary judgment, this Court views the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* The party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

The Age Discrimination in Employment Act ("ADEA") states that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1152

14

(8th Cir. 2007). To survive the City's motion for summary judgment, VanDyke may establish discrimination by the direct or indirect method. *See Ramlet*, 507 F.3d at 1152. Under the direct method, VanDyke can submit direct evidence of discrimination. *See Darke v. Lurie Besikof Lapidus & Co., LLP*, 550 F. Supp. 2d 1032, 1040–41 (D. Minn. 2008) (Schiltz, J.). Or, under the indirect method, VanDyke can create an inference of discrimination under the *McDonnell–Douglas* burden-shifting framework. *Ramlet*, 507 F.3d at 1152; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell–Douglas* burden-shifting framework, VanDyke must first present a prima facie case of discrimination. *Ramlet*, 507 F.3d at 1152. If successful, he establishes a rebuttable presumption of discrimination, and the burden shifts to the City to produce a legitimate, nondiscriminatory reason for the challenged termination. *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934–35 (8th Cir. 2006). If the City proffers a reason, other than age, VanDyke must then point to admissible evidence sufficient to support a finding by a reasonable jury, or factfinder, that the City's reason is pretext for discrimination. *Id.* at 935. "Ultimately, the employee must show that age was the 'but-for' cause of the adverse employment action." *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 611 (8th Cir. 2014), *cert. denied*, 135 S. Ct. 1715 (2015).

Thus, in order to survive the City's motion, VanDyke must establish either direct or indirect discrimination and proffer admissible evidence demonstrating a genuine dispute as to a material fact. *See Anderson*, 477 U.S. at 256.

### B.    Analysis

The City argues that there are no disputed issues of fact with respect to VanDyke's age discrimination claim under the ADEA, and that VanDyke's claim fails as a matter of law. It

argues that: (1) VanDyke does not have any direct evidence of age discrimination; (2) VanDyke fails to establish a prima facie case of age discrimination under the *McDonnell–Douglas* framework; but (3) even if VanDyke establishes a prima facie case, the City had a legitimate, nondiscriminatory reason to terminate VanDyke's employment; (4) and VanDyke cannot show that the City's proffered reason was pretext for discrimination. (City's Mem. in Supp. at 21–30).

In opposition, VanDyke argues that the record raises genuine issues of material fact regarding his claim of age discrimination, making summary judgment at this phase inappropriate. (VanDyke's Mem. in Resp. at 54–56). He states that he has direct evidence of age discrimination; that he has established a prima facie case based on indirect evidence; and that questions of fact remain as to whether the City terminated VanDyke for its stated reasons or because of age. *See* (*Id.*). He submits evidence of the following in support of this contention: (1) awards he earned throughout his employment; (2) the City's retirement incentive plan; (3) provisions of the Manual (truthfulness, conduct, and ethics); (4) MPD's ranking structure; (5) discipline complaints; (6) query screens for administering a report on firearms; and (7) a dictionary definition of the word "dispose." *See* (Pl.'s Ex.).

VanDyke's memorandum consists of a continuing discrimination claim, which has already been dismissed. *See generally* (VanDyke's Mem. in Resp.); *cf. VanDyke*, 2015 WL 138060, at *1. Thus, while this Court views the evidence in the light most favorable to VanDyke, and while sympathetic to VanDyke's position as a *pro se* litigant, it views the evidence only in light of his 2012 termination and not his previously dismissed claim of continuing discrimination.[13]

---

[13]      VanDyke also submits evidence of MPD's Ride-Along Program. *See* (Pl.'s Ex. G at 27–29); (VanDyke's Mem. in Resp. at 21–26). This evidence does not relate to his November 30 termination, but rather to the City's alternative claim that VanDyke violated the policy well

### 1.   Direct Evidence

First, the City argues that VanDyke cannot show that there is a fact dispute about whether there is any direct evidence that he was terminated because of his age. (City's Mem. in Supp. at 22). "[D]irect evidence is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)). For example, direct evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude, comments made during the decisional process that reflect a discriminatory animus, or comments uttered by individuals closely involved in employment decisions. *See Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991). Nevertheless, "[n]ot all comments that reflect a discriminatory attitude will support an inference that an illegitimate criterion was a motivating factor in an employment decision." *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993). For instance, direct evidence does not include "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself." *Ramlet*, 507 F.3d at 1153 (internal quotations omitted).

VanDyke, on the other hand, argues that he was a victim of a "directed attack by [s]upervisors, first at the 4th precinct and later throughout the [MPD]" that resulted in his November 30, 2012 termination. (VanDyke's Mem. in Resp. at 55). He relies on statements made in 2009 and 2010, including a few accusations that he was sleeping on the job, a remark

---

enough throughout his employment history, other than the Firearms incident, to warrant his termination. *See* (City's Mem. in Supp. at 5). But because the Court finds that summary judgment is warranted based on the circumstances surrounding the Firearms incident, the Court need not address this evidence.

17

that he was a "dinosaur," a conversation which stated that putting him back on street patrol might cause him to quit, and questions of when he was going to retire. *See* (VanDyke Dep. at 10–15, 26). VanDyke has not proffered any evidence establishing that any of the above supervisors had a role in the decision to terminate VanDyke. Moreover, VanDyke has not proffered any additional evidence that creates a dispute over whether direct evidence of age discrimination exists. These comments are, therefore, stray remarks or comments by decision makers unrelated to the November 2012 decision to terminate VanDyke—such comments do not constitute direct evidence. *See Ramlet*, 507 F.3d at 1153 (finding that comments made four months before termination, unrelated to the decisional process, and by employees not involved in the decisional process did not constitute direct evidence); *Barket v. NextiraOne, LLC.*, No. 01-cv-278 (ADM/AJB), 2002 WL 1457631, at *3 (D. Minn. July 3, 2002) (Montgomery, J.), *aff'd sub nom. Barket v. NextiraOne*, 72 F. App'x 508 (8th Cir. 2003) (finding that statements relating to retirement did not constitute direct evidence); *Sieden v. Chipotle Mexican Grill, Inc.*, 128 F. Supp. 3d 1133, 1141 (D. Minn. 2015) (Ericksen, J.) (finding statement that employee was "part of the past" did not constitute direct evidence).

For the foregoing reasons, the Court concludes there is no direct evidence of age discrimination. This Court will analyze VanDyke's claim under the classic *McDonnell–Douglas* burden-shifting framework. *See Twiggs v. Selig*, 679 F.3d 990, 993 (8th Cir. 2012). The analysis will focus on whether any aspect of the burden shifting implicates a genuine issue of material fact.

### 2.    *McDonnell–Douglas* Analysis

Ordinarily, VanDyke must establish a prima facie case, *i.e.* that: (1) he was at least forty years old, (2) he was qualified for the position, (3) he was terminated, and (4) he was replaced by

someone sufficiently younger to permit an inference of age discrimination.[14] *Ramlet*, 507 F.3d at 1153. This Court assumes, however, for the purpose of this specific motion, that VanDyke established a prima facie case and moves to the next stage of the *McDonnell–Douglas* analysis. *See Noreen*, 118 F. Supp. 3d at 1137 (foregoing the prima facie analysis where the employer offered a legitimate, nondiscriminatory reason for terminating the employee); *see also Twiggs*, 679 F.3d at 993 (assuming employee established a prima facie case when her claim of gender discrimination failed at the pretext stage of the *McDonnell–Douglas* analysis).

### a.    Legitimate, Nondiscriminatory Reason

Because this Court assumes VanDyke established a prima facie case, the burden shifts to the City to articulate a legitimate, nondiscriminatory reason for his termination. *Loeb v. Best Buy Co.*, 537 F.3d 867, 872 (8th Cir. 2008). "[I]t is not [the Court's] province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997)). This is because "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions. . . . Rather, [the] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Id.* (quoting *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994)).

---

[14]    There are inconsistencies in the Eighth Circuit with respect to the required showing for the fourth prong. *See Noreen v. Pharmerica Corp.*, 118 F. Supp. 3d 1130, 1137, n.9 (D. Minn. 2015) (Kyle, J.) (discussing whether a plaintiff must show that age was factor in the decision or show that they were replaced by someone substantially or sufficiently younger); *see also Bennis v. Minn. Hockey Ventures Grp., LP*, No. 12-cv-341 (SRN/JSM), 2013 WL 3305213, at *11 (D. Minn. June 28, 2013) (Nelson, J.) (addressing the fourth prong using both the "replaced by another person sufficiently younger" and "substantially younger, similarly situated employees were treated more favorably" standards).

The City argues VanDyke was terminated for violating the Manual with respect to truthfulness and ethics. (City's Mem. in Supp. at 27–29). The City terminated VanDyke because he **lied** in the Incident Detail Report and did not run a query, **stored** the Firearms in his personal residence for forty-three days without ever completing an inventory, CAPRS report, or trigger tag, and **returned** the Firearms to an employee at Willman—all in violation of the Manual. (Incident Detail Report at 2–3); (VanDyke Dep. at 52); (IAU Interview Tr. at 9–11). *See generally* (the Manual).

VanDyke argues, at length, that he did not violate the Manual as a result of his decision to store the Firearms in his personal residence for forty-three days. (VanDyke's Mem. in Resp. at 62–69). He states that the IAU did not have any evidence to support his termination and that the investigation was flawed because the Manual allows a police officer to return property to someone if it is lost. (*Id.*). But this Court is not tasked, at this stage, with deciding whether the investigation was fair or even correct. *Wilking*, 153 F.3d at 873. The question before this Court with respect to this stage of the *McDonnell–Douglas* analysis is whether the City has articulated a reason, other than age, to terminate VanDyke. *See id.*

The IAU investigation and panel found VanDyke's actions violated the Manual and the Discipline Matrix recommended termination. *See* (IAU Investigation Report); (Discipline Matrix at 6–8). Thus VanDyke's actions were the basis for a legitimate, nondiscriminatory reason to terminate him. *See Dougherty v. Chisago County*, No. 11-cv-2404 (PJS/TNL), 2013 WL 3974164, at *8–9 (D. Minn. July 31, 2013) (Leung, Mag. J., as adopted by Schiltz, J.) (violation of policy manual satisfied legitimate, nondiscriminatory reason for termination).

For the foregoing reasons, the City carried its burden of the *McDonnell–Douglas* framework, shifting the burden back to VanDyke to demonstrate that the City's proffered reason was pretext for discrimination.

### b.      Pretext for Discrimination

"To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason." *Wilking*, 153 F.3d at 874 (internal quotations omitted); *see also Johnson*, 769 F.3d at 611 (stating that a plaintiff must show that age was the "but-for" cause of the adverse employment action).

VanDyke argues that the following establishes pretext or creates genuine issues as to the material facts that gave rise to his November 2012 termination: (1) MPD's failed investigation; (2) availability of MPD's early retirement plans; (3) MPD's failure to provide adequate training; (4) progressive discipline; and (5) stray comments. (VanDyke's Mem. in Resp. at 70).

### i.      Failed Investigation

VanDyke alleges that the IAU's investigation of the May 3, 2012 incident was flawed and that his age was the real reason for his termination. (VanDyke's Mem. in Resp. at 62–69). In other words, he claims the investigation covered up the City's real goal of age discrimination. (*Id.*). In support, he alleges that the City had no proof that he violated the Manual and that MPD knew he took the Firearms as early as May 3, 2012, but did not notify him of the investigation until June. (*Id.*). Thus, according to VanDyke, MPD must have terminated him because of his age because he was set up to fail. (*Id.*). Other than pure conjecture, however, VanDyke does not offer any evidence in support that would establish pretext, nor does he identify a factual dispute material to this issue.

21

VanDyke suggests that there is a genuine issue for trial surrounding the following facts that gave rise to his termination: (1) his decision to knowingly state in the Incident Detail Report that replica shotguns were found and the absence of a query for the Firearms; (2) his decision not to complete inventory, submit a CAPRS report, or create a trigger tag; and (3) his decision to give the Firearms to a Willman employee. He submits the following evidence in support: a dictionary definition of the word "dispose," the Manual's provisions on truthfulness, conduct, and ethics, gun query screens, and his awards. *See* (Pl.'s Ex. A at 4–10); (Pl.'s Ex. C at 17); (Pl.'s Ex. F at 25); (Pl.'s Ex. K at 31); (Pl.'s Ex. Q at 51–58). This Court disagrees that the foregoing evidence creates a genuine issue for trial.

To begin, VanDyke admitted that he entered the Incident Detail Report that stated **replica** shotguns were found, even though he knew the shotguns were real. (VanDyke Dep. at 47, 54). He also admitted failing to inventory the Firearms, submit a CAPRS report, and create a trigger tag. (*Id.* at 56–57). And finally, he admitted that he gave the Firearms to an employee at Willman without pre-authorization. (*Id.* at 65–66). Each admission is a separate violation of the Manual. *See* (Manual). VanDyke even conceded during the IAU interview that his actions violated the Manual. (IAU Interview Tr. at 13–14); (IAU Investigation Report at 27).

VanDyke argues that by "replica" he meant guns that could not fire and that by "dispose," he meant that Willman would decide what to do with the Firearms upon their return.[15] (VanDyke's Mem. in Resp. at 38–40); *see* (Pl.'s Ex. S at 56–58). The Manual is clear, however, with respect to its provision on truthfulness: police officers shall not "knowingly make an untruthful statement or knowingly omit pertinent information . . . intended for the information of

---

[15]    The latter part of this argument ignores the Manual's requirement that firearms cannot be returned to a civilian absent pre-authorization, which highlights VanDyke's misunderstanding of the Manual's requirement with respect to firearms.

any supervisor . . . . These requirements apply to any report, whether verbal or written, concerning official MPD business including, but not limited to, written reports, transmissions to MECC and officers via radio, telephone, pager, e-mail or MDC." (Manual at 2). VanDyke knowingly stated he found **replica** firearms, even though he knew they were real. (Incident Detail Report at 2); (VanDyke Dep. at 47, 54). Even if his intent was to record that the Firearms could not fire, he should have detailed that information in the Incident Detail Report, or in the CAPRS report and trigger tag—all of which are required of a police officer who obtains a firearm during his or her line of duty. *See* (Manual).

VanDyke further argues that he did not lie to MPD during the investigation when he stated that he and his partner ran a query on the Firearms.[16] (VanDyke's Mem. in Resp. at 41–42). VanDyke submits screen shots of the query screens used by MPD to check whether a firearm is reported stolen, in order to prove that he ran a report on May 3, 2012. (Pl.'s Ex. Q at 51–54). The evidence VanDyke submits, however, does not establish that he ran a report on May 3. *See* (*id.*). Indeed, there is evidence that demonstrates that VanDyke did not run a report on the Firearms on May 3. (Incident Detail Report at 3); (IAU Investigation Report at 3–4, 15, 22). In fact, MPD's only electronic record of a gun query with respect to the Firearms occurred not on May 3, but on June 20, the day VanDyke returned the Firearms to a Willman employee. (IAU Investigation Report at 4, 23). Moreover, when VanDyke was presented during the IAU investigation with the Incident Detail Report, which showed the absence of any query as to whether the Firearms were stolen, VanDyke had no explanation. (IAU Investigation Report at 15).

---

[16]     VanDyke's statements made during the IAU investigation interview are considered "Garrity" statements, which "may be used against [a police officer] in relation to employment allegations." (IAU Interview Tr. at 2); *see Garrity v. State of N.J.*, 385 U.S. 493 (1967).

Further, VanDyke submits no evidence suggesting he had the authority to hold the Firearms in his personal residence or that he was authorized by the Commander to release the Firearms into the custody of a Willman employee. VanDyke submits no evidence that would indicate to a reasonable factfinder that the IAU investigation was flawed or improperly influenced because of his age. He submits evidence of the awards he earned throughout his career, but this would not lead a reasonable factfinder to conclude that his age was the real reason he was terminated. (Pl.'s Ex. A at 4–10). Rather, VanDyke admits he does not have any facts that link the investigation, which led to his termination, to his age. (VanDyke Dep. at 69).

> Q: What, if any, other deviations and protocol or lack of fairness or objectivity do you claim is associated with the Internal Affairs investigation relating to your retention of the three shotguns from Willman Trucking on May 3, 2012? What facts or evidence do you have?
>
> A: None other than the amount of complaints that were filed.
> . . .
> Q: Do you think that the alleged flaws or misinformation in Sergeant Denno's summary were motivated or related to your age?
>
> A: With having proof – I can't say without having proof.
> . . .
> Q: To your knowledge, did Sergeant Novak, Sergeant Taylor or Lieutenant Hayhoe have any involvement in the Internal Affairs investigation or your ultimate termination from the MPD arising from your response to Willman Trucking on May 3, 2012?
>
> A: Not that I could attest to.

(VanDyke Dep. at 33–34, 68–69). Even if VanDyke presented evidence that suggested the investigation was "poorly conducted or that its decision was impetuous," such evidence alone would not allow him to avoid summary judgment because VanDyke fails to show the nexus between the investigation and his age. *See Roeben v. BG Excelsior Ltd. P'ship*, 545 F.3d 639, 643 (8th Cir. 2008) (stating that an employee must not only discredit an employer's asserted

reason for termination, but must also demonstrate that "the circumstances permit a reasonable inference of discriminatory animus") (internal quotations omitted).

VanDyke further argues that the Manual allows a police officer to return property to a rightful owner, under the Manual's lost, stolen, or found property provision. (VanDyke's Mem. in Resp. at 38). As a result, VanDyke states he did not violate the Manual when he gave the Firearms to the Willman employee without pre-authorization. (*Id.*). VanDyke even considered the return of the Firearms within the realm of "public relations." (VanDyke Dep. at 52). This is a misunderstanding of the fact that the Manual requires a different procedure for lost, stolen, or found **firearms**. *See* (Manual at 2–9).

The Manual requires a police officer who obtains a firearm to execute an inventory, submit a CAPRS report, and create a trigger tag. (Manual at 3–9). And before the release of a firearm to a civilian, the Commander, together with the Property and Evidence Unit, must conduct a background check, in order to ensure the recipient of the firearm is not a felon, thereby abiding by Minnesota Statute Section 624.713. *See* (Property & Evidence Procedure); (Manual at 9); *see also* Minn. Stat. § 624.713 (2014) (certain persons not to possess firearms). VanDyke admits he did not do any of the foregoing. *See* (VanDyke Dep. at 65–67).

Thus this Court disagrees with VanDyke that MPD offered "no tangible proof" that he violated the Manual. (VanDyke's Mem. in Resp. at 67). Contrary to VanDyke's assertion, there is evidence that he violated the Manual. *See* (Incident Detail Report at 2) (knowingly states the shotguns were replicas); (Incident Detail Report at 3) (no query completed); (VanDyke Dep. at 65–67) (returned Firearms to third party without background check); (VanDyke Dep. at 58) (stored Firearms in his personal residence for forty-three days); (VanDyke Dep. at 57) (did not

create a trigger tag for the Firearms and did not inventory the Firearms); (VanDyke Dep. at 56)

(did not create a CAPRS report).

Finally, this Court disagrees that the fact MPD knew VanDyke took the Firearms as early

as May 3, 2012, shows pretext. VanDyke testified to the following:

> Q: To your knowledge, [did] anyone in the [P]roperty and [E]vidence [U]nit . . .
> do anything, say anything to make you think that they had contacted . . . Internal
> Affairs as opposed to your supervisor because of your age?
>
> A: I have no proof or evidence.

(VanDyke Dep. at 68). MPD's Property and Evidence Unit received a call from Lisa Wilson on

May 3, when she expressed an interest in keeping the Firearms and then notified the IAU.

(VanDyke Dep. at 34, 68). Because VanDyke failed to complete an inventory, however, the

Property and Evidence Unit and the IAU had little to no corresponding information about the

Firearms requested by Lisa Wilson. Moreover, according to the Incident Detail Report that

VanDyke authored, MPD and the IAU were under the impression **replica** shotguns were found

at Willman and that the caller had disposed of them. *See* (Incident Detail Report at 2).

As a result, VanDyke has not created a genuine issue for trial with respect to the IAU

investigation and its findings that led to his November 30 termination. VanDyke was given an

opportunity, at an interview and subsequent hearing, and during oral arguments to MCSC, to

explain his actions stemming from the May 3, 2012 incident. *See* (IAU Interview Tr.);

(Loudermill Panel Hr'g); (MCSC Determination). During each opportunity, he admitted he

entered the report that stated replicas were found, that he did not inventory the Firearms, and that

he returned the Firearms to a civilian. (*Id.*). The IAU investigation found VanDyke violated the

Manual with respect to truthfulness and ethics, warranting termination. MPD chief Harteau, on

recommendation from the investigatory findings, terminated VanDyke. *See* (Recommendation

for Discharge by MPD). MCSC affirmed his discharge, to which VanDyke chose not to pursue his legal right. *See* (MCSC Determination).

For the foregoing reasons, this Court concludes that VanDyke's allegation that the City's investigation was flawed does not establish a genuine issue as to any material fact related to VanDyke's claim of pretext.

### ii.   Retirement Plans

VanDyke argues that evidence of early retirement plans demonstrates that age motivated his November 2012 termination. (VanDyke's Mem. in Resp. at 70); *see* (Pl.'s Ex. B at 11–15). As recently as 2010, the City offered early retirement plans to police officers. (Pl.'s Ex. B at 11–15). VanDyke alleges those plans "were the impetus to the events that happened to him starting in 2009 that led to his 2012 termination" and submits copies of newspaper articles as support for that proposition.[17] (Pl.'s Ex. B at 12–15); (VanDyke's Mem. in Resp. at 33). Retirement incentive plans are not unlawful where they are consistent with the purposes of the ADEA and are voluntary. *Jankovitz v. Des Moines Indep. Cmty. Sch. Dist.*, 421 F.3d 649, 652 (8th Cir. 2005). VanDyke does not submit any evidence which establishes that the City's retirement plans were involuntary or against the purposes of the ADEA. *See generally* (VanDyke's Mem. in Resp.). Moreover, VanDyke testified to the following:

> Q: What observations do you have or facts or knowledge that the City of Minneapolis's Police Department was attempting to get rid of older officers for the purpose of saving money or any other reason?
>
> A: Only the treatment that I was receiving. That's the only thing I can base it on. The negative treatment that I was getting that I hadn't gotten before.
> . . .

---

[17]   VanDyke submitted articles titled "Rybak calls for 6.5% property tax hike," "Up to 35 Mpls. police, firefighters to get retirement offers," and "Dolan details slim police budget." (Pl.'s Ex. B at 12–15).

> Q: So you don't have any specific facts that the MPD wanted to get rid of older officers to save money?
>
> A: Other than what you hear when you are working with other people, other than what you observe in terms of the other three that I mentioned to you, the three that I knew of, specifically the treatment they were receiving, other than that, written facts or facts spouted to me by an administrator, no.
> . . .
> Q: When you say you hear and observe things, what does that mean that support your conclusion that the MPD wanted to get rid of older officers to save money? What did you hear and observe to support that statement?
> . . .
> A: The buyouts in 2000, 2001, 2002, 2003 and 2010 . . . .

(VanDyke Dep. at 21–23). VanDyke's conclusion that these retirement plans are related to age has no merit, because evidence of early retirement plans from 2010 does not create a nexus between his age and his November 2012 termination. Thus VanDyke has not created a genuine issue for trial that the City's proffered reason—the May 3, 2012 incident—is false, and that VanDyke's age is the real reason.

For the foregoing reasons, this Court concludes that the City's retirement plans do not establish a genuine issue as to any material fact related to VanDyke's claim of pretext.

### iii.    MPD's Failure to Provide Adequate Training

VanDyke also argues that MPD failed to properly train him because MPD wanted to force him into retirement due to his age. (VanDyke's Mem. in Resp. at 70). He cites 29 C.F.R. § 785.29 for the proposition that "training directly related to [his] job is mandatory," and therefore the MPD should have provided additional training for him upon being moved from working at the front desk to street patrol. (*Id.* at 15, 57–58). VanDyke, however, testified to the following:

> Q: Since you joined the Minneapolis Police Department in 1983, have you attended annual in-service training?
>
> A: Yes.

Q: You have attended all the training that has been required of you since 1983?

A: Yes.

Q: Are you aware of any instances in which training was offered to other police officers that you were not allowed to attend or participate in?

A: Not that I can think of.

(VanDyke Dep. at 8). VanDyke has not identified any evidence that would allow a reasonable jury to conclude that MPD neglected his training, much less that the absence of any training was because of his age.

For the foregoing reasons, this Court concludes that VanDyke's allegation that MPD neglected his training does not establish a genuine issue as to any material fact related to VanDyke's claim of pretext.

### iv.     Progressive Discipline

VanDyke also argues he was the victim of a "progressive discipline" campaign by MPD designed to force him into early retirement. (VanDyke's Mem. in Resp. at 61). He argues that his age was MPD's only reason. (*Id.*); *see* (VanDyke Dep. at 14–15). VanDyke argues that in 2012 his work performance was criticized unnecessarily and submits copies of IAU complaints as evidence. (VanDyke's Mem. in Resp. at 25); *see* (Pl.'s Ex. O at 33–49). But this argument is simply VanDyke's claim of continuing discrimination—no longer part of this case—repackaged and repeated.

Q: What happened in 2012?

A: I started getting criticisms of work performance and my CAPRS reports sent back to me on a constant basis by Sergeant Novak.

Q: What makes you think that that was related to your age?

A: Because it was petty. It was not really essential to anything that would be

29

related to inspire me or anything like that. It was a situation where he probably could have called me into the office and saying, hey, you have got to watch how you are doing your typing. Because all of the kickbacks I was getting were typos or hitting wrong key or may a run-on sentence. And I knew of no one else that was getting as many kickbacks as I was. And this would also be in terms of kicking back a report that had one misspelled word. One.

. . .

Q: Even if we are to assume that the reports being sent back to you for the correction of typos, wrong key marks or run-on sentences was petty, what makes you believe that the return of your reports to you was related to your age?

A: It's the only thing I could think of as it being. There would be no need for any criticism otherwise.

Q: Well, did Sergeant Novak use any language with you that would make you think it was age related?

A: No.

. . .

Q: And these reports that were being sent to you for corrections, these are police reports detailing what you had done on street patrol?

A: Yes [. . .] [b]ut my reports were never, you know, inundated with a whole bunch of typos or run-ons. We are talking like one or two misspelled words that sergeants usually do correct themselves when they are reviewing them. They will hit spell check and correct it. Mine weren't.

Q: Do you dispute that your reports actually contained typos, improper spaces or run-on sentences?

A: No.

Q: They contained errors?

A: Twenty-nine of them did, yes.

. . .

Q: Why did you see it as harassment related to your age?

A: What else could it be? I see no other reason for it. Had I been 20 years younger, I don't think I would have gotten that type of feedback from him. I believe he would have corrected my reports.

(*Id.* at 15–20). VanDyke's conclusions, however, are not enough to survive summary judgment.

*See Erenberg v. Methodist Hosp.*, 240 F. Supp. 2d 1022, 1033 (D. Minn. 2003) (Davis, J.), *aff'd*,

357 F.3d 787 (8th Cir. 2004) (allegation that employer did not discipline other employees for similar infractions was insufficient to prove pretext).

VanDyke submits no evidence that demonstrates that any progressive discipline was related to his age, much less the termination in November 2012. Instead, he states that age must be the reason because "[his] name coming before the IAU had become a normal occurrence" and the criticisms were "petty" and "not really essential" to his job and that he believed the supervisor should have corrected the errors himself. (VanDyke Dep. at 15–20); *see* (VanDyke's Mem. in Resp. at 61). But those characterizations do not demonstrate an inference between discipline and his age. Moreover, VanDyke admits that he does not have any facts to support an inference between this discipline and his age. (VanDyke Dep. at 20–21).

For the foregoing reasons, this Court concludes that the foregoing criticisms do not establish a genuine issue as to any material fact related to VanDyke's claim of pretext.

### v.  Stray Comments

Finally, VanDyke argues that comments made between 2009 and 2011 show pretext. (VanDyke's Mem. in Resp. at 70). He invokes the "cat's paw" theory of discrimination, which "provides that an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design."[18] (*Id.* at 56–57); *see Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009).

---

[18]  For a background on the "cat's paw" theory of discrimination, see *Staub v. Proctor Hospital*, 562 U.S. 411, 416, n.1 (2011) ("The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire.

In 2009, Sergeant Novak stated that VanDyke "was getting old" and that he was a "dinosaur" and sometime between 2009 and 2011, Sergeant Novak asked when VanDyke was going to retire. (VanDyke Dep. at 10–14, 25–28). VanDyke was also accused of sleeping on the job. (*Id.*). Additionally, sometime in 2009 VanDyke overheard a conversation between lieutenants that if he were put back on street patrol, "maybe he would quit." (*Id.*). Generally, with respect to stray comments, the Court considers the following factors: whether the comments were made by employees who took part in the decision or influenced the decision, the time lapse between the comment and the termination, and whether the statement itself exhibits discriminatory animus or merely an opinion that such animus may exist. *Wittenburg v. Am. Express Fin. Advisors, Inc.*, 464 F.3d 831, 837 (8th Cir. 2006).

VanDyke argues these comments were made by supervisors who in turn influenced MPD's decision to terminate him, thus the "cat's paw." (VanDyke's Mem. in Resp. at 56–57). In support, VanDyke submits evidence of MPD's ranking structure. (Pl.'s Ex. E at 21–23). While VanDyke may be correct to state that these individuals made decisions within MPD, VanDyke has not submitted any evidence that would lead a reasonable jury to conclude that these individuals had a role in the decision to fire him. *See, e.g.*, *Erenberg*, 240 F. Supp. 2d at 1033 ("Case law supports the notion that isolated comments that are remote in time and not related to the employment decision are insufficient to establish pretext for discrimination."). The record reflects that the chief of police has the ultimate decision to terminate a police officer and VanDyke submits no evidence suggesting the chief knew about the comments made between

---

After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.").

2009 and 2011. *Cf. Bennis*, 2013 WL 3305213, at *18 (finding comments made by employee who did not partake in decisional process did not establish pretext). The chief did not have any involvement in the IAU investigation of the May 3, 2012 incident; she only reviewed its findings. *See generally* (VanDyke Dep. at 34–39).

Moreover, the comments took place anywhere from one to three years before VanDyke was terminated and Sergeant Novak, Sergeant Taylor, and Lieutenant Lindback, even according to VanDyke, were not involved in the IAU's investigation; thus VanDyke has not established pretext. (VanDyke Dep. at 10–14, 25–28); c*f. Frieze v. Boatmen's Bank of Belton*, 950 F.2d 538, 541–42 (8th Cir. 1991) (comments made four years before termination by an employee not related to decisional process did not establish pretext). To the extent Sergeant Novak asked when VanDyke was going to retire sometime between 2009 and 2011, this does not create an inference that his 2012 termination was based on age. *See Frieze*, 950 F.2d at 541–42. Further, VanDyke admits that these supervisors did not play a role in the City's decision to terminate him. (VanDyke Dep. at 33–35, 39–41, 69). Thus, VanDyke's conclusion that age must be related to his termination falls short of establishing a genuine issue for trial, and he has not submitted any evidence that creates the nexus between his age and his 2012 termination.

For the foregoing reasons, this Court concludes that the foregoing comments do not establish a genuine issue as to any material fact related to VanDyke's claim of pretext.

### d.    Conclusion

In summary, the City proffered a nondiscriminatory reason for its decision to terminate VanDyke—VanDyke knowingly stated in his Incident Detail Report that replica shotguns were found at Willman and he did not properly run a query to see if the shotguns were stolen; he failed to complete an inventory, CAPRS report, or trigger tag; and he gave three shotguns to a civilian

33

without pre-authorization. All of these actions violated the Manual and as a result, MPD's Discipline Matrix recommended termination and Chief Harteau terminated VanDyke. VanDyke has not presented sufficient evidence to create a genuine issue of material fact that the City's articulated reason for his termination was pretextual. Therefore, the Court recommends that the City's Motion for Summary Judgment be granted.

## IV.    RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    The City of Minneapolis's Motion for Summary Judgment [Doc. No. 48] be **GRANTED**;

2.    And this action be dismissed with prejudice.

Dated:      May 20, 2016

_s/Steven E. Rau_
STEVEN E. RAU
United States Magistrate Judge

### Notice

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after objections are filed; or (2) from the date a timely response is filed.